## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

| | |
|---|---|
| CONTRAVEST INC., CONTRAVEST CONSTRUCTION COMPANY, and PLANTATION POINT HORIZONTAL PROPERTY REGIME OWNERS ASSOCIATION, INC., as assignee, <br><br> Plaintiffs, <br><br> vs. <br><br> MT. HAWLEY INSURANCE COMPANY, <br><br> Defendant. | No. 9:15-cv-00304-DCN-MGB <br><br> **REPORT AND RECOMMENDATION** |

The following matter is before the undersigned United States Magistrate Judge on plaintiffs ContraVest, Inc., ConraVest Construction Company, and Plantation Point Horizontal Property Regime Owners Association, Inc.'s (collectively, "plaintiffs") motions to compel, ECF Nos. 103, 105, 106, and 113, and defendant Mt. Hawley Insurance Company's ("defendant") motion to reconvene. These motions were referred to the undersigned by order of the Honorable David C. Norton. ECF No. 124. For the following reasons, the undersigned recommends granting plaintiffs' motions to compel and defendant's motion to reconvene.

## I.  BACKGROUND

The instant action arises out of an insurance dispute between plaintiff ContraVest Construction Company ("Contravest") and defendant. Contravest constructed a development known as Plantation Point in Beaufort County, South Carolina. Compl. ¶ 1. Defendant provided Contravest with certain policies of excess commercial liability

1

insurance for coverage periods spanning from July 21, 2003 to July 21, 2007.  Id. ¶ 5.  In September 2011, plaintiff Plantation Point Horizontal Property Regime Owners Association, Inc. (the "Owners Association") filed suit against Contravest alleging certain defects in the construction of Plantation Point (the "underlying action").  Id. ¶¶ 10, 11.  After repeated demands from Contravest, defendant refused to defend, indemnify, or otherwise participate in the underlying action.  Id. ¶ 15.  Contravest ultimately settled the underlying action and assigned the Owners Association all rights and claims it had against defendant for improperly refusing to participate in that action.  Id. ¶ 18.  On December 22, 2014, plaintiffs filed the instant action in the Court of Common Pleas for Beaufort County, bringing claims for declaratory judgment, bad faith, breach of contract, and unjust enrichment against defendant.  Id. 24–48.  The action was later removed to this court on January 22, 2015.  ECF No. 1.

On May 19, 2015, plaintiffs served their first set of requests for production, which sought defendant's Plantation Point claim file dealing with the underlying action.  ECF No. 117 at 1.  Defendant produced the file with a corresponding privilege log on July 13, 2015, and later supplemented its production with the file's electronic claim notes and a supplemental privilege log on January 13, 2016.  Id.  On February 29, 2016, plaintiffs served their second set of requests for production, this time seeking all of defendant's claim files for policies held by Contravest.  Id. at 1–2.  These files contain information regarding claims involving other Contravest construction projects that required defendant to evaluate its exposure as Contravest's excess insurer.  Defendant produced these materials on a rolling basis.  Id. at 2.  As such, defendant produced responsive material

and corresponding privilege logs on May 26, 2016, June 7, 2016, June 14, 2016, and July 7, 2016. Id at 3–4.

Plaintiffs filed four separate motions in connection with this discovery. On June 24, 2016, plaintiffs filed a motion to compel in connection with the May 26, 2016 privilege log. ECF No. 103. On June 29, 2016, plaintiffs filed a motion to compel in connection with the January 13, 2016, June 7, 2016, and June 14, 2016 privilege logs. ECF No. 105. On July 1, 2016, plaintiffs filed another motion to compel defendant to comply with their second set of discovery requests. ECF No. 106. Defendant filed a joint response to these motions on July 18, 2016. ECF No. 110. In its joint response, defendant also moved to reconvene the deposition of Contravest's Rule 30(b)(6) witness, John Schaffer ("Schaffer"). Id. Plaintiffs then filed another motion to compel documents withheld under the July 7, 2016 privilege log, which included a response to defendant's motion to reconvene. ECF No. 113. Defendant filed a response to the most recent motion to compel and a reply in support of the motion to reconvene on August 15, 2016. ECF No. 117. Finally, plaintiffs filed a reply on August 25, 2016. ECF No. 120. The undersigned held a hearing on September 19, 2016, and the matter is now ripe for the court's review.

## II.  STANDARD

The Federal Rules of Civil Procedure provide that a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id. "The court may, for good cause, issue an order to protect a party or person from annoyance,

embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "The

scope and conduct of discovery are within the sound discretion of the district court."

Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co., 56 F.3d 556, 568 n.16 (4th Cir.

1995) (citing Erdmann v. Preferred Research, Inc. of Ga., 852 F.2d 788, 792 (4th Cir.

1988)).

### III.  DISCUSSION

Despite the number of motions at issue, plaintiffs' motions essentially raise the

following three basic issues:  (1) whether information regarding defendant's reinsurance

and reserves is relevant and discoverable; (2) whether the attorney-client privilege or

work product protection is available to protect information contained in defendant's

claim files; and (3) whether plaintiffs waived any objection to the privilege logs produced

in connection with the July 13, 2016 document production.  The court also addresses

defendant's request to reconvene Schaffer's deposition.

### A.        Reinsurance and Reserve Information

A number of plaintiffs' document requests seek correspondence, memoranda, file

notes, and reports related to defendant's reinsurance policies and reserve estimates.  ECF

Nos. 103-2, 105-1–105-4, 113-1.  Plaintiffs argue that such materials are relevant to their

bad faith claim and unprotected by the work-product doctrine.  ECF No. 103 at 3–4; ECF

No. 105 at 13–14; ECF No. 113 at 5.  Defendant contends that such information is not

relevant.[1]  ECF No. 110 at 6–7.  Entries 56 through 66 in the July 6, 2015 privilege log

---

[1] The bulk of defendant's privilege logs simply list the reason for withholding
these materials as "reinsurance" or "reserve."  In certain instances, defendant refers to a
"reinsurance/reserve privilege," which appears to simply be a reference to the decisions
finding such information irrelevant.  ECF No. 117 at 8–9.

4

also assert work-product protection over various communications to defendant's reinsurers.[2]  ECF No. 105-4 at 5–6.

### 1.       Reinsurance-Related Information

Reinsurance policies are insurance policies issued to insurers which allow the insurers to further spread the risks incurred by their own policies.  1 Practical Tools for Handling Insurance Cases § 7:28.  Defendant asserts that "courts have held that reinsurance information is 'typically' not subject to disclosure."  ECF No. 110 at 8.  Though some courts have certainly reached this conclusion, the court is not convinced the position has been as universally adopted as defendant suggests.  As an initial matter, at least one of the cases cited by defendant to support this position actually holds that reinsurance-related information is irrelevant to determine whether or not coverage exists under a policy.  See Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp., 268 F.R.D. 692, 695 (S.D. Fla. 2010) ("[T]his Court does not believe that this information is relevant to the factual matter of whether Royal Bahamian is entitled to coverage.").  This inquiry is distinct from whether a denial of coverage was made in bad faith.  More importantly, a number of other courts have held that reinsurance-related information is relevant to bad faith claims.  See, e.g., Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am., 2009 WL 1247122, at *4 (E.D. La. May 5, 2009) (recognizing that "relevance is by nature a context-sensitive determination," but holding that "there is no question in this case that

---

[2] Although the July 6, 2015 privilege log does not list "reinsurance" among the grounds for protecting these communications from discovery, it does list "relevance," which appears to implicate the same concerns as the entries in later privilege logs that simply list "reinsurance" or "reserve" as the applicable ground.  ECF No. 105-4 at 5–6.  Notably, entries 67 through 69 similarly list "relevance" and "work-product," but also add "attorney-client" privilege.  Id.  Plaintiffs do not appear to challenge the applicability of attorney-client privilege in the reinsurance and reserve context, and therefore, those entries are omitted from the court's decision.

communications between Travelers and its reinsurers . . . are likely to contain information that is relevant to the issue of [] bad faith"); J. Mitchell Smith & Frank T. Messina, Discoverable or Not: Whether Reinsurance Agreements and Communications Are Discoverable in Federal Courts, 79 Def. Couns. J. 80, 83 (2012) (noting that "federal courts have appeared reticent to allow discovery of [reinsurance] communications for the purpose of construing and interpreting the underlying insurance policy," but some courts have allowed discovery of such information for purposes other than "construction of the underlying policy").  Thus, the weight of authority does not appear to tip heavily in favor of either position.

Courts have offered different explanations for why reinsurance-related information is irrelevant in the bad faith context.  Some courts rest their decision on a determination that reinsurance decisions are essentially business decisions, and do not reflect policy interpretations.  See, e.g., Heights at Issaquah Ridge Owners Ass'n. v. Steadfast Ins. Co., 2007 WL 4410260, at *4 (W.D. Wash. Dec. 13, 2007) ("Reinsurance involves an insurance company's effort to spread the burden of indemnification. [] It is a decision based on business decisions and not questions of policy interpretation.").  Other courts have held that this is not necessarily the case, recognizing that reinsurance-related information may reflect a number of different factors, such as "the nature and extent of the [i]nsurers' claims investigations, their interpretations of policies, and potential admissions on coverage." First Horizon Nat'l Corp. v. Houston Cas. Co., 2016 WL 5869580, at *13 (W.D. Tenn. Oct. 5, 2016) (quoting First Horizon Nat'l Corp. v. Certain Underwriters at Lloyd's, 2013 WL 11090763, at *8 (W.D. Tenn. Feb. 27, 2013)); Imperial Trading, 2009 WL 1247122, at *3 (finding communications with reinsurers

"relevant to [the insurer's] good faith  to the extent that [the insurer] explained its reasons for granting or denying portions of plaintiffs' claims or otherwise described or explained its handling of plaintiffs' claims").  The undersigned takes the latter position.  The court sees no reason to simply assume that information exchanged with a reinsurer will not reveal the insurer's view of the underlying claim.  Of course, this is only one possible outcome.  If an insurer provides information clarifying the content of the disputed reinsurance information, discovery may be inappropriate, but defendant has not done so here.  Absent such a showing, the court finds no reason to preclude discovery of the requested information in this case.

Another often cited argument against the discoverability of reinsurance-related information holds that such information carries little probative value because "reinsurance in the face of denial of coverage might suggest bad faith," while at the same time, "bad faith [might] be demonstrated with the opposite outcome—lack of reinsurance."  Great Lakes Dredge & Dock Co. v. Commercial Union Assur. Co., 159 F.R.D. 502, 504 (N.D. Ill. 1995).  Whatever the merits of this argument may be, it is inapplicable here.  Plaintiffs have explained that they are not interested in the existence or non-existence of defendant's reinsurance policies.  Indeed, they appear to be well aware that such policies exist.  Instead, plaintiffs seek discovery of the reinsurance-related information in an effort to determine why defendant changed certain coverage positions as time passed and it became clear the excess policies would be forced to cover a substantial judgment.  ECF No. 105 at 10–12.  The probative value argument advanced in Great Lakes does not address this possibility, and thus, provides no obstacle to plaintiffs' discovery requests in this case.

7

Therefore, the court recommends that the requested reinsurance-related information is relevant.

## 2.     Loss Reserve Information

Loss reserves are estimates of an insurer's losses under their policies. "Setting reserves is a method of managing litigation in which attorneys, claims adjusters and/or line personnel compile their mental impressions and opinions concerning the substance of the litigation as well as the cost of litigation." Nicholas v. Bituminous Cas. Corp., 235 F.R.D. 325, 329–30 (N.D.W. Va. 2006). Defendant again argues that courts have reached a consensus position, holding that reserve information is irrelevant to bad faith, ECF No. 110 at 7, and again, the court finds that this consensus is not as strong as defendant suggests—at least, not in this jurisdiction.

In this district, the Imperial Textiles Supplies Inc. v. Hartford Fire Ins. Co. court explained that "[w]hile most courts agree that reserve information is irrelevant in the context of a coverage dispute, [] courts are split regarding whether reserve information is relevant in an action alleging bad faith." No. 6:09-cv-03103, 2011 WL 1743751, at *3 (D.S.C. May 5, 2011). Subsequently, the McCray v. Allstate Ins. Co. court observed that "where a party has brought a bad-faith insurance claim, reserve evidence has been held admissible, when it 'is relevant to show the insurer's state of mind in relation to its claim settlement practices.'" No. 3:14-cv-02623, 2015 WL 6408048, at *6 (D.S.C. Oct. 22, 2015) (quoting First Nat'l Bank of Louisville v. Lustig, 1993 WL 411377, *1 (E.D. La. Oct. 5, 1993)). This position also appears to have some modicum of support in other parts of this circuit. See Nicholas, 235 F.R.D. at 330 ("Although reserve information generally has been held to be irrelevant in cases involving coverage issues, [Erie Ins.

Prop. & Cas.] recognized that a few courts had determined that such information is relevant in bad faith cases" (citing State ex rel. Erie Ins. Prop. & Cas. Co. v. Mazzone, 625 S.E.2d 355, 359–50 (W.Va. 2005)).  The court is therefore unconvinced that the law is so settled that further inquiry is unnecessary.  Instead, courts have emphasized that "[t]he determination of the relevance of reserve information depends on the circumstances of each case."  Imperial Textiles Supplies, 2011 WL 1743751, at *4.

Here, reserve information would seem relevant to plaintiffs' bad faith claim to the extent such information reveals defendant's assessment of the validity of Contravest's claims for excess coverage.  It is entirely possible that reserves will not reflect the insurer's subjective assessment of the claim.  Bondex Int'l, Inc. v. Hartford Acc. & Indem. Co., 2006 WL 355289, at *2 (N.D. Ohio Feb. 15, 2006) (finding that reserves "do not normally entail an evaluation of coverage based upon a thorough factual and legal consideration when routinely made as a claim analysis").  But courts have recognized that they may reflect such information.  See Park-Ohio Holdings Corp. v. Liberty Mut. Fire Ins. Co., 2015 WL 5055947, at *4 (N.D. Ohio Aug. 25, 2015) ("Information about the levels of reserve that insurance companies set aside for individual claims is relevant as information about [d]efendant's valuation of the claims and could demonstrate a lack of good faith regarding settling the claim."); Bernstein v. Travelers Ins. Co., 447 F. Supp. 2d 1100, 1107 (N.D. Cal. 2006) (recognizing that in some circumstances, reserves may be relevant to insurer's subjective state of mind in bad faith cases).  Again, the court sees no reason to simply assume that the reserves in this case are irrelevant.  Because reserves are used to offset potential losses, it makes sense that an insurer would account for the likelihood that the claim will be deemed to fall within the scope of coverage in setting the

claim's reserve level. If defendant wished to demonstrate that its reserve policies did not reflect this determination, it certainly had the opportunity to do so.

Absent such a showing, the undersigned recommends that reserve information is relevant in the context of plaintiffs' bad faith claim.

### 3.    Work-Product Doctrine

Defendant invokes the work product doctrine in a number of entries in the July 6, 2015 privilege log listing communications with defendant's reinsurers.[3]  ECF No. 105-4 at 5–6.  Not all courts apply the work product doctrine to reserve information.  See Park-Ohio Holdings, 2015 WL 5055947, at *4 ("Neither the work product doctrine nor the attorney-client privilege protect such information.").  Nevertheless, a number of courts in this circuit—more specifically, in the Southern District of West Virginia—have applied the work-product doctrine to reserve information.  Nicholas, 235 F.R.D. at 322; Mordesovitch v. Westfield Ins. Co., 244 F. Supp. 2d 636, 643 (S.D.W. Va. 2003); Chambers v. Allstate Ins. Co., 206 F.R.D. 579, 590 (S.D.W. Va. 2002).  In Nicholas, for example, the district court found no clear error in the magistrate's ruling that reserve information was protected work-product in a bad faith action against a liability insurer.  235 F.R.D. at 332.  The court noted that "the plaintiffs [] retained an attorney shortly after [an] underlying motor vehicle accident who then [] contacted [the insurer]," and reasoned that once the insurer had notice that the accident might result in litigation, "it viewed the Nicholases as plaintiffs, and evaluated not only the substance of their claims but also the

---

[3] At the hearing, defendant's counsel assured the court that any claims of work-product protection were labelled as such.  Thus, the court does not consider whether other reinsurance or reserve information is protected work-product.

potential financial consequences to the company resulting from a lawsuit." Id.  The

Nicholas court nevertheless recognized that

> no hard and fast rule exists to determine when a document has been
> created in the ordinary course of business and is not protected by the work
> product doctrine, or when a document is prepared "in anticipation of
> litigation," and, is, therefore, protected. Consequently, a court must
> carefully analyze the factual circumstances under which the requested
> documents were created, consider the purpose of the representatives in
> preparing the requested documents, and examine the documents
> themselves.

Id.

Here, there is no indication that defendant viewed Contravest as a potential

plaintiff when it was setting the loss reserves on Contravest's claims.  "For the work

product doctrine to apply, '[t]he document must be prepared because of the prospect of

litigation when the preparer faces an actual claim or a potential claim following an actual

event or series of events that reasonably could result in litigation.'"  Gilliard v. Great

Lakes Reinsurance (U.K.) PLC, No. 2:12-cv-00867, 2013 WL 1729509, at *2 (D.S.C.

Apr. 22, 2013) (emphasis in original) (quoting Nat'l Union Fire Ins. Co. of Pittsburgh,

Pa. v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir. 1992)).  Determining whether

the preparer faced the prospect of litigation seems especially important in the liability

insurance context, as any claim on a liability policy will most likely involve the prospect

of litigation against the insured.  Insurers must necessarily investigate the claims made by

their insureds, and for liability insurers this necessarily entails an investigation into their

insureds' potential liability.  Assessing the impact of that liability on the insurer's own

reserve fund decisions would also seem a necessary component of the insurer's

operations.  Thus, the court concludes that it is not enough to show that the reserves were

prepared by a liability insurer in anticipation the insured's underlying litigation.

Therefore, the undersigned recommends that entries 56 through 66 in the July 6, 2015 privilege log are not protected work-product.

B.    **Claim Files**

Plaintiffs next argue that material contained within the various Contravest claim files is not protected work-product and to the extent the attorney-client privilege applies, it has been waived.  ECF No. 105 at 6–11.  Nevertheless, plaintiffs do not seek immediate discovery of these materials, but instead, request an in camera review.  Id. at 2; ECF No. 102 at 1.  The parties do not discuss the particular documents at issue, but the privilege logs reveal them to be primarily communications, invoices, and checks.  ECF Nos. 103-2, 105-1–105-4, 113-1.

1.    **Work Product**

Defendant argues that plaintiffs' reliance on In re Joe Gibson's Auto World, Inc., 2010 WL 5136155, at *1 (Bankr. D.S.C. Aug. 10, 2010), is misplaced because that case does not hold that the work-product doctrine is unavailable in bad faith cases, only that the documents at issue in that case were not made in anticipation of litigation.  ECF No. 110 at 4.  The fact that there is no per se rule prohibiting the use of the work-product doctrine in bad faith cases does not explain why it should apply here.

The burden of proving the work-product doctrine applies rests with the proponent. Gilliard, 2013 WL 1729509, at *2.  This court has observed that "[b]ecause an insurance company has a duty in the ordinary course of business to investigate and evaluate claims made by its insureds, the claims files containing such documents usually cannot be entitled to work product protection."  Gilliard, 2013 WL 1729509, at *2 (quoting Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Cos., 123 F.R.D. 198, 202 (M.D.N.C. 1988)).

12

This reasoning would seem to apply squarely to the documents at issue here. Certainly, defendant has not provided any indication that its handling of the Contravest claim files departed from the ordinary course of business.

Therefore, the undersigned recommends that defendant has failed to meet its burden. However, because plaintiffs only seek an <u>in camera</u> review of the disputed material, the court will consider the application of the work-product doctrine when conducting said review.

### 2.     Attorney-Client Privilege

The attorney-client privilege dispute is more substantial. In diversity cases, the application of the attorney-client privilege is governed by state law. Fed. R. Evid. 501. Under South Carolina law, "[t]he attorney-client privilege protects against disclosure of confidential communications by a client to his attorney." <u>State v. Owens</u>, 424 S.E.2d 473, 476 (S.C. 1992). The privilege consists of the following essential elements:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

<u>Tobaccoville USA, Inc. v. McMaster</u>, 692 S.E.2d 526, 529–30 (S.C. 2010) (quoting <u>State v. Doster</u>, 284 S.E.2d 218, 219–20 (S.C. 1981)). "[T]he burden of establishing the [attorney-client] privilege rests upon the party asserting it." <u>Wilson v. Preston</u>, 662 S.E.2d 580, 585 (S.C. 2008).

Plaintiffs rely on <u>City of Myrtle Beach v. United Nat. Ins. Co.</u>, No. 4:08-cv-1183, 2010 WL 3420044, at *5 (D.S.C. Aug. 27, 2010), to argue that defendant has "voluntarily inject[ed]" factual and legal issues into this case, thereby waiving the attorney-client

13

privilege. ECF No. 105 at 7. In the <u>City of Myrtle Beach</u> decision, the court addressed

the application of the attorney-client privilege in bad faith actions. The court first

emphasized South Carolina's requirement that the proponent of the privilege establish the

absence of waiver. <u>City of Myrtle Beach</u>, 2010 WL 3420044, at *5. Drawing support

from the "widely accepted approach" in <u>Hearn v. Rhay</u>, 68 F.R.D. 574, 581 (E.D. Wash.

1975), the court held that "if a defendant voluntarily injects an issue in the case, whether

legal or factual, the insurer voluntary waives, explicitly or impliedly, the attorney-client

privilege."[4] <u>Id.</u> Applying this test to the plaintiff's motion to compel, the court found

that the defendant insurer injected a number of issues into the case through its answer and

affirmative defenses, but had not shown that these issues did not waive the privilege. <u>Id.</u>

at *7. The court specifically noted that even though the defendant did not contend that it

reasonably relied on the advice of counsel, defendant still bore the burden of disproving

waiver. <u>Id.</u>

In reaching its conclusion, the <u>City of Myrtle Beach</u> court made one other

significant finding: "that the City has presented a prima facie case of bad faith." <u>City of</u>

<u>Myrtle Beach</u>, 2010 WL 3420044, at *7. To understand the function of the prima facie

requirement, one must first understand the predicament a defendant insurer faces in a bad

---

[4] Though the <u>City of Myrtle Beach</u> court appeared to adopt <u>Hearn</u>, it did not
actually set forth the elements of the <u>Hearn</u> test. The <u>Hearn</u> test provides that the
privilege is waived when:

> (1) assertion of the privilege was a result of some affirmative act, such as
> filing suit, by the asserting party; (2) through this affirmative act, the
> asserting party put the protected information at issue by making it relevant
> to the case; and (3) application of the privilege would have denied the
> opposing party access to information vital to his defense.

<u>Hearn</u>, 68 F.R.D. at 581. Instead, the <u>City of Myrtle Beach</u> court relied on its own
formulation of the test.

faith action.  Because any defendant insurer who opposes a bad faith claim is almost forced to assert its own good faith, the City of Myrtle Beach approach makes it rather difficult for a defendant to avoid waiver.  The City of Myrtle Beach court even recognized that its "ruling amount[ed] to a virtual per se waiver of the privilege."[5]  The prima facie showing requirement serves to constrain this effect and prevent automatic waiver whenever a plaintiff brings a bad faith claim.  Though the City of Myrtle Beach court did not explain the significance of this finding in detail, the Hearn decision on which it relied supports this understanding of the doctrine.  Recognizing the damage the proposed exception could do to the attorney-client privilege, the Hearn court held that "[a] substantial showing of merit to plaintiff's case must be made before a court should apply the exception to the attorney-client privilege defined herein."  Hearn, 68 F.R.D. at 582.

In this case, plaintiffs have made a sufficient prima facie showing to invoke the City of Myrtle Beach waiver doctrine.  Contravest made a number of claims under the same excess policies at issue in this case before filing the Plantation Point claim in September 2011.  In correspondence regarding these claims, Contravest appeared to take the position that its excess policies would provide coverage after certain underlying policies provided by Axis Surplus Insurance Company (the "Axis policies") were exhausted.  See, e.g., ECF No. 105-9, Countney Landing Claim Letter ("The Limits of Liability on each policy are shown to be $10 million each occurrence, excess of $1

---

[5] The Myrtle Beach court did reject a true per se waiver rule and explained that the "virtual per se waiver" in that case was a function of the defendant's failure to demonstrate how its defenses did not waive the privilege, not the doctrine itself.  City of Myrtle Beach, 2010 WL 3420044, at *7.  Still, it is difficult to imagine how a defendant insurer could avoid this fate.

million each occurrence under underlying insurance provided by [the Axis policies].").

There is evidence that since these previous claims impaired the Axis policies it became

clear that further claims would implicate defendant's excess policies, <u>see</u> ECF No. 133-2,

Jewett Email 8/12/2013 (indicating that defendant would be on the "front line for any

upcoming Contravest claims" following the settlement of the Courtney Landing case),

prompting defendant to change its coverage position by claiming that the Axis policies

were not the only underlying policies that required exhaustion.  <u>See</u> ECF No. 105-10,

Plantation Point Claim Letter (stating defendant's belief that Contravest "has substantial

primary insurance in effect that is and remains unexhausted, including (but not limited to)

[the Axis policies]").[6]  Plaintiffs also identify an email from one of defendant's claims

adjusters which states that "they"—presumably, defendant—"better have more to rely on

than their continuous progressive exclusion," which could be read to signify a mindset of

trying to find exclusions to justify a coverage decision that was not based on the language

of the policies.  ECF No. 105.[7]

Defendant argues that plaintiffs' prima facie showing is "belied by their own

documents and wholly unsupported by any evidence."  ECF No. 110 at 8–9.  As outlined

in the preceding paragraph, the court does not agree that the showing is unsupported by

<u>any</u> evidence.  Essentially, defendant seems to argue that the evidence identified by

plaintiffs to support their prima facie showing should actually be interpreted differently.

---

[6] The court notes that the letter asserting this position was sent on February 7, 2012, well before the August 12, 2013 email indicating that defendant was "on the front line" for future Contravest claims.  Nevertheless, the court thinks it reasonable to infer that defendant recognized this possibility well before August, 2013, given that the Courtney Landing claim was submitted in March, 2011.  ECF No. 105-9, Courtney Landing Claim Letter.

[7] For whatever reason, Plaintiffs do not produce this email, but do identify the Bates Number as 0080, and defendant does not dispute the contents of the email.

As an initial matter, the fact that competing inferences can be drawn from a piece of evidence, or the fact that competing evidence may exist, does not take away from plaintiffs' prima facie showing.  It simply means that the prima facie showing is not undisputed, which is of little significance for the purposes of this motion.  Moreover, much of defendant's argument on this point depends on its reading of the excess policies and fails to address plaintiffs' argument that these readings were motivated by bad faith. For instance, defendant points to the "Other Insurance" provision of the policy to show that it never changed its position that the Axis policies were the only policies that required exhaustion.  Id. at 9.  But the "Other Insurance" provision simply recognizes that other policies will require exhaustion if they exist and are available to cover a loss covered by the excess policies.  Id.  The correspondence highlighted by plaintiffs reveals—or, at least, appears to reveal—a change of position on a different issue: whether, in fact, any such "other insurance" did exist and was available.  Thus, plaintiff's prima facie showing on this issue goes to defendant's application of the "Other Insurance" provision in this case.

In addition to challenging plaintiffs' prima facie showing, defendant also argues that the City of Myrtle Beach decision reflects an incorrect application of South Carolina waiver law.  Id. at 5–6.  Defendant cites to Justice Pleicones's concurrence in Davis v. Parkview Apartments, which did not directly address City of Myrtle Beach, but did criticize the Hearn test as inconsistent with the well-established rule that waiver of the attorney-client privilege must be "unequivocal" and "implied waiver should be treated with caution."  762 S.E.2d 535, 549 (S.C. 2014), reh'g denied (S.C. Sept. 11, 2014).  The Davis concurrence argued that Hearn does too much damage to the attorney-client

17

privilege because it bases waiver on the introduction of any issue to which privileged communications are relevant, rather than introduction of the communications themselves. Id. at 550.  The concurrence also disagreed with courts that have characterized the Hearn test as widely accepted, claiming that just the opposite is true.  Id. ("Hearn has been rejected by most courts and many commentators").  The Davis concurrence supports an approach that only implies waiver in bad faith actions where the insurer actually asserts a defense based on its reliance on the advice of counsel, rather than simply asserting good faith.

Despite Justice's Pleicones's concurrence in Davis, the City of Myrtle Beach decision has been well received in this district.  The court in Hege v. Aegon USA, LLC relied heavily on the City of Myrtle Beach, holding as follows:

> Like the insurer in City of Myrtle Beach, Transamerica asserts, as affirmative defenses, that it acted in good faith and that its decision to change its payment methodology was reasonable.  It also asserts that it engaged in no unlawful conduct and that it did not breach any common law or contractual duty owed to Plaintiffs.  Under [] City of Myrtle Beach, Transamerica has put at issue the evidence Life Investors' decisionmakers had before them and the basis for their subjective evaluation.

No. 1:10-cv-1635, 2011 WL 1791883, at *5 (D.S.C. May 10, 2011).  Another court in this district reached a similar conclusion in State Farm Fire & Cas. Co. v. Admiral Ins. Co., citing City of Myrtle Beach in holding that the plaintiff waived the privilege by asserting that it acted in good faith in its answer to one of the defendant's counterclaims. See No. 4:15-cv-2745, 2016 WL 4051271, at *4 (D.S.C. July 25, 2016) (holding that the plaintiff's assertion of its own good faith "waives privilege and work product protections").

18

While the court has sympathy for Justice Pleciones's position, the fact remains that the <u>Davis</u> concurrence does not carry the force of law.[8]  Given the favorable treatment <u>City of Myrtle Beach</u> has received from other courts in this district, the undersigned is forced to conclude that the weight of authority supports its application. The court also recognizes that, despite the problems highlighted in the <u>Davis</u> concurrence, the <u>City of Myrtle Beach</u> framework has its merits.  At the very least, it prevents defendants from immunizing portions of the claims evaluation process from discovery by simply transferring those tasks to lawyers, which is alleged to have occurred here, and as explained above, the prima facie showing requirement provides some counterweight against disclosure to prevent the doctrine from devolving into a <u>per se</u> waiver rule.  Therefore, the court will follow the recent trend in this district and apply the <u>City of Myrtle Beach</u> approach.

Here, defendant denies having acted in bad faith.  Thus, under <u>City of Myrtle Beach</u>, defendant has "injected" issues of law and fact into this case that may be affected by information in the privileged documents.  The undersigned therefore recommends the court conduct the requested <u>in camera</u> review of the disputed documents.  This review will serve as a safeguard against the production of irrelevant material and allow the court to more precisely apply the work product doctrine.  However, because the attorney-client privilege has been waived, the court will not address that issue in its review.

---

[8] Justice Plecones's opinion was actually a partial concurrence and dissent, which only reached the privilege issue by dissenting from the majority's finding that it need not review the merits of the circuit court's discovery order to decide the contempt and sanctions issues presented by the appellants.  <u>Davis</u>, 762 S.E.2d at 548.  Notably, Justice Plecones's opinion was not joined by any other members of the court.

C.     **Timeliness of Objections**

Defendant argues that, to the extent plaintiffs' objections are valid, they are nevertheless untimely with respect to the July 6, 2015 privilege log.  ECF No. 117 at 3. Defendant points out that no motion related to the July 6, 2015 document production was filed until January 25, 2016, and that motion was later withdrawn.  ECF No. 59.  Thus, defendant contends, all arguments with respect to that production and the related privilege log are untimely and waived.

Local Civil Rule 37.01 requires motions to compel to be "filed within 21 days after receipt of the discovery response to which the motion to compel is directed."  Local Civ. Rule 37.01 (D.S.C.).  Clearly, plaintiffs' motions are untimely under Rule 37.01. Instead, plaintiffs argue that Local Rule 7.03 is the more appropriate rule to apply in these circumstances.  Rule 7.03 provides that "[a]ttorneys are expected to file motions immediately after the issues raised thereby are ripe for adjudication."  Local Civ. Rule 7.03 (D.S.C.).  Plaintiffs argue that because they were required to make a prima facie showing of bad faith before they could bring their motion under City of Myrtle Beach, their motion was not ripe for adjudication until they had an opportunity to develop that showing.

The court first notes that plaintiffs have already filed a motion to compel with respect to certain communications between defendant, its adjusters, and its counsel listed in the July 6, 2015 and January 13, 2016 privilege logs.  ECF No. 59.  At the March 23, 2016 hearing, defendant agreed that this motion could be withdrawn without prejudice to allow plaintiffs to address the issues after receiving all of the privilege logs.  ECF No. 134, Hr'g Tr. 63:25–64:15.  Thus, the court has little trouble finding that plaintiffs were

20

entitled to postpone filing their objections to the privilege logs until defendant provided the complete set of privilege logs.

Were this not enough, the court also finds that plaintiffs' delay constituted "excusable neglect" under Rule 6(b), which provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time: . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b). "[F]actors to be considered in determining whether excusable neglect has occurred: '[1] danger of prejudice to the [non-movant], [2] the length of delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith.'" Cronin v. Henderson, 209 F.R.D. 370, 371 (D. Md. 2002) (first alteration added) (quoting Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship, 507 U.S. 380, 395 (1993)). The undersigned sees no risk of prejudice to defendant—especially considering defendant agreed to allow plaintiffs to delay their motion—and plaintiffs have offered a good explanation for their delay. There is no indication the delay will significantly affect the proceedings and plaintiffs appear to have acted in good faith.

Therefore, the undersigned recommends that plaintiffs' motions to compel are not untimely with respect to defendant's July 6, 2015 privilege log.

### D.    Motion to Reconvene

Finally, defendant moves to reconvene Schaffer's deposition. ECF No 110 at 11–13. Defendant offers two arguments in support of its motion. Defendant first contends that at the deposition, Schaffer relied on a document that was not previously provided to

21

defendant.  Id. at 11.  When defendant sought to obtain the document, plaintiffs objected

on the basis of privilege.  Id. at 11–12.  However, plaintiffs never moved for a protective

order after the deposition.  Id.

> Local Civil Rule 30.04(c) provides that
>
> Counsel directing that a witness not answer a question on those grounds or
> allowing their clients to refuse to answer a question on those grounds shall
> move the court for a protective order under Fed. R. Civ. P. 26(c) or
> 30(d)(3) within seven (7) days of the suspension or termination of the
> deposition.  Failure to timely file such a motion will constitute waiver of
> the objection, and the deposition may be reconvened.

Local Civ. Rule 30.04(c) (D.S.C.).  The plaintiffs clearly claimed privilege over the

document itself, but counsel never explicitly directed Shaffer not to answer any questions

on the basis of privilege.  ECF No. 110-2, Schaffer Dep. 17:5–25.; ECF No. 117 at 10

(admitting defendant never questioned Schaffer on the document).  Nevertheless, it seems

fairly clear from the hearing transcript that, as a practical matter, defendant's question

was cut short by plaintiffs' assertion of privilege.  Schaffer Dep. 17:5–25.  The court

regards the parties' current dispute as an unfortunate misunderstanding.  While the court

recognizes that plaintiffs' counsel relied on a fair—if somewhat technical—reading of the

Local Rule 30.04(c), it also finds that defense counsel was reasonable in believing that

the rule had been triggered by defense counsel's claim of privilege.  Local Rule 30.04(c)

is ill-fitted to these circumstances.

Rather than punishing defense counsel for forgoing the empty exercise of

questioning Schaffer on the document or punishing plaintiff's counsel for relying on Rule

30.04(c), the undersigned has conducted an in camera review to determine if the

document is, in fact, privileged.  The document in question turns out to be a deposition

preparation document from the underlying litigation.  The document outlines a number of

potential deposition topics.  Though it is not made explicit, the document appears to have

been prepared by Contravest's counsel in the underlying litigation.  The document also

contains a number of handwritten notes that outline answers to the potential questions.

While the notations were presumably written by Shaffer himself, it is not clear that these

notations reflect any particular communications with Contravest's counsel.  Because the

proponent of the attorney-client privilege bears the burden of establishing its application

to a particular communication, State v. Doster, 284 S.E.2d 218 (S.C. 1981), this

uncertainty must be resolved in favor of disclosure.  The outline of topics may

nevertheless be regarded as a communication by Contravest's counsel to Shaffer.

Communications from the attorney to the client may be protected by the privilege, but

only insofar as these communications reflect confidential information provided by the

client.  Marshall v. Marshall, 320 S.E.2d 44, 47 (S.C. Ct. App. 1984) ("When the attorney

communicates to the client, the privilege applies only if communication is based on

confidential information provided by the client.").  Again, the court cannot simply

assume that the elements of the privilege are satisfied and the nature of the outlined

topics does not suggest that the document was based on confidential client

communications.  Thus, the undersigned recommends that the document is not privileged,

and therefore, Shaffer's deposition should be reconvened to allow further question on

matters contained within the document.[9]

      Defendant also argues that Schaffer's deposition should be reconvened so that it

can question him on Contravest's various insurance policies during the relevant policy

_____

[9] To the extent plaintiffs argue that the document is not relevant to the instant
action, the court first notes that attorney-client privilege was the only objection raised at
the deposition.  Moreover, the document contains information on Contravest's insurance
policies which appears relevant to this action.

years.  ECF No. 110 at 12.  Defendant contends that it previously sought to elicit such information through its requests for admission and counterclaims, but Contravest claimed that it did not possess such information.  Id. at 12–13.  At his deposition, Shaffer admitted that Contravest's controller could obtain such information.  Shaffer Dep. 53:4–12. Plaintiffs subsequently produced a document that purports to list the insurance policies Contravest has, and has had, in effect for each of its projects (the "insurance list").  See ECF No. 113-5.  Defendant seeks the opportunity to question Schaeffer using this insurance list after he has consulted with his controller as to how it was collected.

Given the persistence with which defendant has sought to discover the range of the policies that could possibly be implicated by this litigation, the undersigned believes it would be useful to reconvene Schaffer's deposition for the purposes of putting the issue to rest.  To this end, defendant would be well advised to do everything in its power to ensure that it is able to fully investigate this issue at the reconvened deposition.  If the deposition reveals further legitimate areas of inquiry, that is one thing, but the undersigned is likely to view future discovery disputes on this matter with a discerning eye.

Plaintiffs last argue that defendant's motion is untimely because it was not brought within 21 days of the deposition under Local Rule 37.01.  As discussed above, Rule 37.01 governs the timing of motions to compel following discovery responses. Defendant's motion to reconvene is not a motion to compel.  Thus, Local Rule 37.01 does not apply.

Therefore, the undersigned recommends granting defendant's motion to reconvene Schaffer's deposition for the purposes of questioning Schaffer on information

contained in the document withheld under seal and on matters relating to the insurance list.  The undersigned further recommends that, based on the defendant's representations at the hearing, the reconvened deposition must be conducted by phone or in some other minimally intrusive manner agreed upon by the parties.

### IV.   CONCLUSION

For the foregoing reasons, the undersigned recommends the court: (1) **GRANT** plaintiffs' motions to compel as to the reinsurance and reserve information; (2) **GRANT** plaintiffs' motion to compel the claim file materials withheld on the basis of work product protection and attorney-client privilege, and conduct the requested in camera review of such materials; and (3) **GRANT** defendant's motion to reconvene Schaffer's deposition.

**IT IS SO ORDERED.**

December 12, 2016
Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE