**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

CONTRAVEST INC., CONTRAVEST )
CONSTRUCTION COMPANY, and )
PLANTATION POINT HORIZONTAL )
PROPERTY REGIME OWNERS )
ASSOCIATION, INC., as assignee, )
                                  )
            Plaintiffs, )
                                  )      No. 9:15-cv-00304-DCN
         vs. )
                                    )          **ORDER**
MT. HAWLEY INSURANCE COMPANY, )
                                  )
          Defendant. )
_____ )

The following matter is before the court on defendant Mt. Hawley Insurance

Company's ("Mt. Hawley") motion for summary judgment, ECF No. 193. For the

reasons set forth below, the court grants in part and denies in part the motion.

## I.  BACKGROUND

Plaintiffs bring this action based on Mt. Hawley's refusal to provide benefits

allegedly owed under certain policies of excess commercial liability insurance. Plaintiff

ContraVest Construction Company constructed a development known as Plantation Point

in Beaufort County, South Carolina. Mt. Hawley provided ContraVest Construction

Company, plaintiff ContraVest Inc. (collectively, "ContraVest"), and other policyholders

with excess commercial liability insurance through four policies:

> Policy No. MXL0356978, effective July 21, 2003 to July 21, 2004 ("03–04
> Policy")
> Policy No. MXL0359180, effective July 21, 2004 to July 21, 2005 ("04–05
> Policy")
> Policy No. MXL0359627, effective July 21, 2005 to July 21, 2006 ("05–06
> Policy")

Policy No. MXL0365074, effective July 21, 2006 to July 21, 2007 ("06–07 Policy")

ECF Nos. 193-2–193-5 ("the Excess Policies"). The 03–04 Policy lists a policy issued by Sheffield, which Mt. Hawley believes to now be Axis, as ContraVest's general liability policy. ECF No. 193-2 at 4. The other excess policies list a policy issued by Axis or AXIS Surplus (collectively, "Axis") as ContraVest's general liability policy. ECF Nos. 193-3 at 2; 193-4 at 2; 193-5 at 4.

Specific provisions in the Excess Policies are discussed in more detail below, but as an initial matter, the Excess Policies contain a term that states: "This policy, except where provisions to the contrary appear herein, is subject to all the conditions, agreements, exclusions, and limitations of and shall follow the underlying insurance in all respects. This includes changes by endorsement." The Excess Policies at 5/6[1] (the "Follow Form Clause"). Plaintiffs note that Mt. Hawley is a non-admitted surplus lines insurance company in South Carolina, meaning that the South Carolina Department of Insurance does not regulate or approve Mt. Hawley's insurance forms.

ContraVest was previously named as a defendant in another construction defect case, <u>Courtney Landing Condominium Association v. Contravest, Inc. et al</u> ("Courtney Landing action"). ContraVest sought insurance coverage under the Excess Policies in that action as well. Mt. Hawley issued various reservation of rights letters, stating that "[t]he Mt. Hawley policies are Excess Liability Policies and are not potentially responsive unless and until exhaustion of the underlying insurance has taken place." ECF No. 105-8 at 3; 105-9 at 3; 105-10 at 8. Plaintiffs contend that these letters gave

---

[1] The 06–07 Policy uses different page numbers than the other Excess Policies; therefore, the number after the "/" denotes the page number of the 06–07 Policy.

ContraVest a reasonable expectation that Mt. Hawley would indemnify once ContraVest's underlying Axis policies were exhausted. On August 12, 2013, Mt. Hawley received notice that the settlement of the Courtney Landing action exhausted the Axis 2005 policy and impaired the 2006 policy by $908,334. ECF No. 195-2. An email about the settlement that was sent on the same day and produced by Mt. Hawley states "[n]o money from Mt. Hawley, but I suspect that it is on the front line for any upcoming Contravest claims since it looks like Zurich and Axxes [sic] are exhausted." ECF No. 113-2 at 2.

On September 16, 2011, plaintiff Plantation Point Horizontal Property Regime Owners Association, Inc. (the "Owners Association") filed suit against ContraVest and others alleging that the Plantation Point property was defectively constructed (the "underlying action"). ContraVest provided notice of the underlying action to Mt Hawley. In response, Mt. Hawley issued a letter on February 7, 2012, in which it stated that it had "no present obligation" under the Excess Policies and that it would monitor the matter under a complete reservation of rights. ECF No. 75-4.

On August 26, 2013, M. Dawes Cook, Jr. and Barbara J. Wagner, both attorneys for ContraVest, sent a memorandum to ContraVest's insurers to update them on the progress of the underlying action. ECF No. 30-3. The memorandum contains a chart showing ContraVest's various insurance policies, and the chart reflects that the 05–06 Axis policy was exhausted and "Mt. Hawley excess." Id. at 3. The chart also reflects that the 06–07 Axis policy was eroded and "Mt. Hawley excess." Id. Between this memorandum and the August 12, 2013 email about the Courtney Landing action

settlement, plaintiffs argue that Mt. Hawley knew that one Axis policy was exhausted and another was eroded.

On December 20, 2013, Michael Prough, Mt. Hawley's coverage counsel, sent Catherine Bolger, counsel for ContraVest, a reservation of rights letter. In it, he explained that Mt. Hawley took the position that it had no present obligation to ContraVest because ContraVest had "substantial primary insurance in effect that is and remains unexhausted, including (but certainly not limited to) the primary insurance with [Axis] underlying Mt. Hawley's policy years." ECF No. 75-5 at 5. The letter also addresses various potions of the Excess Policies that Mt. Hawley could use as a basis to decline or limit coverage.

On February 24, 2014, ContraVest's attorneys sent another memorandum to ContraVest's insurers about the underlying action. ECF No. 30-4. In that memorandum, the attorneys noted that the plaintiffs in the underlying action claimed $30 million in repairs, ContraVest estimated $1.5 million in repairs, and that a jury would likely find somewhere in between these two estimates but "probably closer" to the $30 million estimate. Id. at 3.

On March 10, 2014, Ms. Bolger sent a letter to ContraVest's carriers to inform them that a second mediation in the underlying action failed but that the parties were able to identify a realistic settlement range. ECF No. 195-5 at 2–3. Ms. Bolger explained that if ContraVest does not settle, then ContraVest could be the only defendant left at trial in the underlying action with exposure to a $30 million judgment. Id. at 3. Ms. Bolger stated that "Contravest paid for insurance and excess/umbrella insurance for all of these years and should not be put into a position where it is exposed to such a judgment." Id.

She continued by informing the carriers that "[t]o not settle the case under these circumstances would be in bad faith and we will not hesitate to file an action if the case is not resolved prior to trial." Id. She concluded the letter by suggesting a coverage mediation as soon as possible.

On May 1, 2014, Mr. Prough sent Ms. Bolger a letter with additional information on Mt. Hawley's coverage position. First, Mr. Prough notes that Axis denied coverage under its 2003–04 and 2004–05 policies due to a residential occupancy exclusion. ECF No. 75-5 at 1. Mr. Prough notes that the Excess Policies follow form to the Axis policies regarding the exclusion, and that the fact that Axis extended no coverage under those two policies means that the 03–04 Policy and the 04–05 Policy could not be implicated. As such, Mt. Hawley's understanding of ContraVest's tender was that it was only seeking coverage under the 05–06 Policy and the 06–07 Policy. Mr. Prough then provides Mt. Hawley's position as to those two policies and Mt. Hawley continued to reserve its rights.

Mr. Prough sent Ms. Bolger another letter on May 2, 2014 expressing concern over ContraVest's settlement negotiations. ECF No. 195-8. He stated that Mt. Hawley was "concerned by the potential that schemes or discussions may be under consideration by Contravest and certain of its insurers, working with [the underlying action] plaintiffs [sic] lawyers, to hope to 'set up' claims against one or more of its other insurers." Id. at 2. He explained further: "In particular, it may occur to some primary insurers and Contravest to seek to pass off their obligations for the alleged loss to excess carriers by helping plaintiffs set up a position against those policies." Id. Mr. Prough explained that

> Mt. Hawley will not hesitate to join all insurers and insureds into any action attempting to enforce any manufactured claim against its excess policies, whether via declaratory judgment, equity, breach of contract, indemnification, contribution or any other available legal theory or remedy.

5

> Exhaustion of all primary coverage cannot be manufactured and Mt. Hawley will insist that any party attempting this be accountable for its full limits or for all uninsured or self-insured periods or sums.

Id. He concluded by stating that Mt. Hawley was "sending this letter only to Contravest, not its other insurers, to use the information as it best sees fit" and that Mt. Hawley "would strongly request that any resolution or settlement Contravest and its primary insurers may contemplate truly reflect the full and final resolution of the action. Anything less will be neither full nor final for any party." Id.

On May 4, 2014, the attorney for the plaintiffs in the underlying action sent Ms. Bolger a letter with their settlement demand of $4.5 million and urging her to demand that ContraVest's insurance carriers settle the underlying action. ECF No. 193-6. The next day, May 5, Ms. Bolger forwarded the letter to Mr. Prough and Andrew Epting, another Mt. Hawley attorney, to seek $1.2 million as Mt. Hawley's portion of the settlement and stated that "[i]f you fail to respond timely, the insured plans to do whatever is reasonably necessary to protect itself from a potential $30,000,000 judgment. This may include, but is not limited to, some sort of a Confession of Judgment or promissory note along with an assignment of all policy rights and bad faith claims against Mt. Hawley." ECF No. 193-7. ContraVest gave a deadline of 3:00 p.m. on the same day, May 5, by which it needed a response from Mt. Hawley. Mr. Prough responded to Ms. Bolger's letter on the same day stating that Mt. Hawley's positions remain the same, and that there were reports that ContraVest announced that it reached a settlement in the underlying action, making ContraVest's 3:00 pm deadline moot. ECF No. 193-8.

On or about June 5, 2014, a settlement agreement was executed for the underlying action. ECF No. 1-3 ("the settlement agreement"). The entities and individuals that were both party to the settlement agreement and named insureds on some or all of the Excess

Policies include Center Contract of Central Florida, LLC d/b/a ContraVest builders, Gerald Ogier, Mark Ogier, John Schaffer, ContraVest Construction Company, and ContraVest Inc. Id. at 1. Mt. Hawley was not a party to the settlement agreement and did not consent to it. See id. at 4 (identifying Mt. Hawley as a "non-participating insurer"). In the settlement agreement, certain insurance carriers ("participating insurers") agreed to pay the Owners Association $3.3 million. Id. at 5. In return, the plaintiffs in the underlying action, the defendants in the underlying action, and the participating insurers agreed to a mutual release. Id. at 8. ContraVest separately confessed to a judgment of $ 9 million ("Confession of Judgment") and assigned any and all of its rights against Mt. Hawley to the Owners Association and the other plaintiffs in the underlying action. Id. at 6. Moreover, ContraVest released the participating insurers from any and all claims relating to or arising from the Plantation Point property. Id. at 9. A final order approving the settlement was entered in the underlying action on June 5, 2014. ECF No. 1-5.

The Confession of Judgment was made by ContraVest, Inc., ContraVest Construction Company, Ashley Plantation Limited Partnership, and Ashley Plantation Development Corporation. ECF No. 1-4. It was signed on May 5, 2014. Id. at 4. Interestingly, all four companies had been dissolved before the Confession of Judgment was signed. John Schaffer ("Schaffer"), the corporate representative for ContraVest, testified at his deposition that ContraVest, Inc. was dissolved on January 5, 2011. ECF No. 193-10, Schaffer Depo. 24:20–25. ContraVest Construction Company was dissolved on December 31, 2007. Schaffer Depo. 21:14–22:12. Ashley Plantation Limited Partnership was dissolved in 1998, and Ashley Plantation Development Corporation was dissolved in 1999. Schaffer Depo. 33:5–23. That means that the only two entities who

are Mt. Hawley insureds, ContraVest, Inc. and ContraVest Construction Company, and who are exposed under the Confession of Judgment are dissolved.

Plaintiffs filed this action in state court on December 23, 2014, and Mt. Hawley removed the action on January 22, 2015. Plaintiffs bring the following causes of action: (1) a declaratory judgment that declares that Mt. Hawley owed ContraVest a duty to defend, settle, and indemnify in the underlying action; (2) bad faith; (3) breach of contract for failing to investigate claims in the underlying action, failing to defend the underlying action, and failing to indemnify ContraVest; and (4) unjust enrichment. The age of this case is due, in part, to an discovery dispute regarding attorney-client privilege that has been considered by three different courts. Mt. Hawley filed its motion for summary judgment on October 29, 2019. ECF No. 193. Plaintiffs responded on November 12, 2019, ECF No. 195, and Mt. Hawley replied on November 26, 2019. ECF No. 198. The court held a hearing on the motion on January 22, 2020. The motion is fully briefed and ripe for review.

## II. STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

## III. DISCUSSION

Mt. Hawley argues that summary judgment on all four causes of action is warranted on the following grounds: (1) Mt. Hawley had no duty to defend or settle the underlying action; (2) Mt. Hawley is not obligated to pay the Confession of Judgment based on the language of the Excess Policies; (3) Mt. Hawley is not obligated to pay the Confession of Judgment because it results from a settlement agreement in which the insurer remains liable, but the insured is insulated from any obligation to pay; and (4) plaintiffs are not legally entitled to relief for their complaint of unjust enrichment.[2] The court addresses each in turn, finding that summary judgment is warranted for plaintiffs' declaratory judgment claim, breach of contract claim, and unjust enrichment claim. The court declines to grant summary judgment on plaintiffs' bad faith claim.

### A. Duty to Defend and Settle

Mt. Hawley argues that it clearly had no duty to defend or settle the underlying action based on both the language of the Excess Policies and common law, meaning that

---

[2] Mt. Hawley reserves the right to seek summary judgment on other grounds, such as the applicability of certain exclusions and the issue of exhaustion.

summary judgment in favor of Mt. Hawley as to those two declaratory judgments is warranted.  Beginning with the policy language, the Excess Policies state:

> I. INSURING AGREEMENT
>
>> B.  Defense and Expense of Claims and Suits
>>
>>> 1.   We shall not be obligated to assume charge of or participate in the settlement or defense of any claim made, or suit brought, or proceedings instituted against the insured.   However, we shall have the right and opportunity to be associated with the insured in the defense of any claim, suit or proceeding which, in our opinion, may create liability under the terms of this policy.  If we assume such right and opportunity, we shall not continue to defend or participate in the defense of any claim or suit after the applicable limit of liability of this policy has been exhausted.

The Excess Policies at 5/6.  Mt. Hawley contends that this plain and unambiguous language clearly means that Mt. Hawley had no duty to defend ContraVest in the underlying action or to settle the underlying action.  Mt. Hawley also notes that ContraVest was not defenseless in the underlying action, as Axis and other carriers provided a defense.

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law."  Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008).  "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language."  Beaufort Cty. Sch. Dist. v. United Nat'l Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003)).  "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect."  Id. (citing Schulmeyer, 579 S.E.2d at 134).  "The obligation of the insurer under an insurance policy is defined by the terms of the

policy itself, and cannot be enlarged by judicial construction." Scottsdale Ins. Co. v. GS Thadius LLC, 328 F. Supp. 3d 527, 533 (D.S.C. 2018), case dismissed sub nom. Scottsdale Ins. Co. v. NEM Inc., 2019 WL 4862163 (4th Cir. May 14, 2019). However, an insurance contract which is "in any respect ambiguous or capable of two meanings" must be construed strictly against its drafter, the insurer. Reynolds v. Wabash Life Ins. Co., 161 S.E.2d 168, 169 (S.C. 1968)).

Here, the language of the Excess Policies clearly states that Mt. Hawley is not obligated to defend or settle any case against its insured. In response, plaintiffs cite to various cases that they claim stand for the proposition that an excess insurer owes a duty to defend once the underlying insurance policy limits are exhausted; however, none of the cases cited by plaintiffs apply South Carolina law. Indeed, it appears that South Carolina courts have not confronted the question of whether an excess insurer owes a duty to defend, which leaves the court with the language of the Excess Policies that clearly states Mt. Hawley has no such duty. That language complies with the general law on this issue. According to Insurance Claims & Disputes, "[m]ost courts have held that an excess insurer that has a duty to defend is not obligated to provide a defense if the primary insurer is so obligated." Allan D. Windt, Excess insurer's duty to defend, 1 Insurance Claims and Disputes § 4:11 (6th ed.). Indeed, "since the primary insurer's duty, once activated, encompasses the claims that have been made against the insured regardless of whether they are in excess of the primary insurer's policy limits, the excess insurer's duty to defend does not come into existence." Id. This rule applies when the primary insurer has assumed the defense, which occurred here.

Moreover, under South Carolina law, an insurer's duty to defend extends even once the policy limits are exhausted. See Nationwide Mut. Ins. Co. v. Simmonds, 434 S.E.2d 277, 278 (S.C. 1993) ("We hold that tender of its policy limits did not relieve Nationwide of the obligation to defend its insured."). Therefore, ContraVest's primary insurer Axis had the duty to defend, which it undertook, and that duty continued even after the Axis 05–06 policy was exhausted. Because the duty to defend belonged to Axis, even after the exhaustion of any Axis policies, and based on the clear language of the Excess Policies, the court finds that Mt. Hawley had no duty to defend ContraVest.

Plaintiffs argue that Mt. Hawley cannot rely on this no-duty-to-defend provision because Mr. Hawley breached the Excess Policies and cannot now enforce a self-serving provision. To show a breach of the Excess Policies, plaintiffs first point to a clause in the Excess Policies which states:

IV. CONDITIONS

J. CONFORMITY— Terms of this policy which are in conflict with the laws of the state wherein this policy is issued are hereby amended to conform to such laws.

The Excess Policies at 10/12 ("Conformity Clause"). Plaintiffs claim that South Carolina law applies under the Conformity Clause based on S.C. Code Ann. § 38-61-10, and that S.C. Code Ann. § 38-59-20 sets forth various improper conduct that Mt. Hawley has allegedly committed. S.C. Code Ann. § 38-61-10 states that "[a]ll contracts of insurance on property, lives, or interests in this State are considered to be made in the State and all contracts of insurance the applications for which are taken within the State are considered to have been made within this State and are subject to the laws of this State." S.C. Code Ann. § 38-59-20 provides a list of various conduct by insurance companies that

constitutes improper claim practices, such as providing misleading or deceptive information about coverage.

The court is unclear as to how this translates to Mt. Hawley breaching the Excess Policies. The Conformity Clause simply stands for the proposition that any policy terms that conflict with South Carolina law are amended to conform with South Carolina law. Plaintiffs do not point to any particular provision in the Excess Policies that they claim conflicts South Carolina law, nor do they identify any action by Mt. Hawley that breaches that provision of the Excess Policies. In addition, as plaintiffs admit, S.C. Code Ann. § 38-59-20 does not create a private cause of action.

The cases to which plaintiffs cite do not clearly apply to their argument. In Williams v. Gov't Employees Ins. Co. (GEICO), the Supreme Court of South Carolina found that a family step-down provision in an insurance policy was void because it violated public policy based on a totally different statute, S.C. Code Ann. § 38-77-142. 762 S.E.2d 705, 712–17 (S.C. 2014). S.C. Farm Bureau Mut. Ins. Co. v. Dawsey stands for the proposition that "insurers have the right to limit their liability and to impose conditions on their obligations provided they are not in contravention of public policy or a statutory prohibition." 638 S.E.2d 103, 104 (S.C. Ct. App. 2006). The court takes plaintiffs' citation to these two cases to draw the court's attention to the fact that a provision in an insurance policy can be void if it contravenes public policy, specifically S.C. Code Ann. § 38-59-20. However, plaintiffs have not pointed to any provision within the Excess Polices that contravenes S.C. Code Ann. § 38-59-20, and even if they did, it would not mean that Mt. Hawley breached the Excess Policies. Instead, it would mean that the provision was void. In sum, plaintiffs seem to allege that Mt. Hawley's actions

13

violate S.C. Code Ann. § 38-59-20, not the actual language of the Excess Policies, but that has no bearing on whether Mt. Hawley breached the Excess Policies.

Plaintiffs also argue that Mt. Hawley breached the Excess Policies based on the Follow Form Clause. Plaintiffs contend that Axis did not assert that the "residential exclusion" applied to the Axis 05–06 policy but that "Mt. Hawley raised this specious argument for the first time 4 days before trial." ECF No. 195 at 9. This, plaintiffs argue, is a breach of the Follow Form Clause. In the May 1, 2014 letter to which plaintiffs refer, Mr. Prough states:

> Although Axis has taken the position that its 2005-06 policy is exhausted (by payments it made on different, prior claims), please note that the policy also contains the endorsement excluding coverage for apartments that are converted to residential condominiums [the residential exclusion]. Likewise, the Mt. Hawley 2005-06 excess policy follows form to that exclusion for the 2005-06 policy period. Thus, Mt. Hawley must continue to reserve all rights to deny coverage under that policy for any judgment or settlement that may result, if any, including but not limited to the application of the referenced exclusion.

ECF No. 75-5 at 1–2. In other words, while Axis did not deny coverage under the Axis 05–06 policy based on the residential exclusion, Mt. Hawley still determined that the residential exclusion would apply to its 05–06 Policy. However, Axis could not deny coverage on that basis because the Axis 05–06 policy was already exhausted, meaning it had no reason to determine whether the residential exclusion would apply. It appears Mt. Hawley takes the position that because Axis denied coverage based on this exclusion in its other policies, that Mt. Hawley would be following form to those denials by applying the same exclusion to the 05–06 Policy. Because Mt. Hawley could not follow form on the Axis 05–06 policy, given that no coverage determination was made due to exhaustion, the court fails to see how Mt. Hawley's position on the residential exclusion in its 05–06 Policy is a breach of the Follow Form Clause.

In sum, the court is unconvinced that Mt. Hawley breached the Excess Policies with regard to any of these instances. Moreover, even if Mt. Hawley were to breach the Excess Policies, the second half of plaintiffs' argument fails. Plaintiffs essentially assert a theory of estoppel, arguing that Mt. Hawley cannot both enforce one provision of the Excess Polices while breaching another. In doing so, plaintiffs rely on an Illinois case interpreting Illinois state law to which they provide no meaningful citation for the court to find the case.[3] See ECF No. 195 at 14. Plaintiffs provide no citation to South Carolina law that an insurer is estopped from enforcing certain provisions of its policy when it breaches other portions of the policy. Therefore, even in light of plaintiffs' estoppel argument, the court still finds that Mt. Hawley had no duty to defend ContraVest in the underlying action.

Mt. Hawley also argues that it had no duty to settle the underlying action under the Tyger River doctrine, which is based on Tyger River Pine Co. v. Maryland Cas. Co., 170 S.E. 346 (S.C. 1933), because Mt. Hawley never undertook the defense of ContraVest. As this court explained in Church Creek Constr., LLC v. Mt. Hawley Ins. Co.:

> South Carolina courts have not explicitly stated that the Tyger River doctrine does not apply when the insurance company never assumed the defense of the insured, but their discussion of Tyger River assumes that the insurer accepted the defense of the insured. See Miles v. State Farm Mut. Auto. Ins. Co., 120 S.E.2d 217, 220 (S.C. 1961) (focusing on the insured's bad faith claim instead of the Tyger River claim because the insurer never assumed or undertook control of the insured's claim); see also Snyder v. State Farm Mut. Auto. Ins. Co., 586 F. Supp. 2d 453, 459 (D.S.C. 2008) ("One situation in which South Carolina law does impose a duty to settle is in a liability case in which the insurer assumes the defense of the insured

---

[3] Plaintiffs simply provide the name of the case, the case number, and the date on which the order was filed. They do not specifically identify the court and only refer to it as "an Illinois Court." ECF No. 195 at 14. Nor do they provide a copy of the case.

and the insured may potentially be exposed to liability above and beyond the policy limits." (emphasis added)); State Farm Mut. Auto. Ins. Co. v. Arnold, 276 F. Supp. 765, 766 (D.S.C. 1967) ("[I]f the insurer, in undertaking the defense of a suit covered by its liability policy, negligently defends or unreasonably refuses to settle within policy liability limits, it is liable in tort to the insured for the amount of the judgment against him in excess of the policy limit." (emphasis added)). In State Farm Mut. Auto. Ins. Co., the court distinguished a claim for refusing to defend an insured and a Tyger River claim by explaining that in the first claim, the insurer has denied coverage, while in the other, the insurer conceded coverage. 276 F. Supp. at 766. This suggests that an insurance company must concede coverage and assume the defense of its insured before it can be liable under the Tyger River doctrine.

2019 WL 689545, at *3 (D.S.C. Feb. 19, 2019). Here, Mt. Hawley never undertook ContraVest's defense, and as such, Mt. Hawley contends that it had no duty to settle the underlying action.

In response, plaintiffs attempt to distinguish Church Creek but do so unsuccessfully. First, they claim that Mt. Hawley had control of the settlement of the case, and that because one Axis policy had been exhausted and another had been partially depleted, ContraVest had a "reasonable expectation" that Mt. Hawley "had an obligation to step in under its duty to deal fairly and in good faith with its insured." ECF No. 195 at 11 (emphasis added). However, this argument goes towards whether Mt. Hawley acted in good faith, not whether Mt. Hawley had a duty to settle.

Plaintiffs also argue that Mr. Prough's May 1, 2014 letter was Mt. Hawley "actively tr[ying] to scuttle the proposed settlement when it discovered that assignment of claims was going to be included," id. at 12, and plaintiffs interpret this as Mt. Hawley interfering with the settlement and then hiding behind its No Action Clause, which is discussed in detail below. Plaintiffs contend that the Tyger River court would disapprove of Mt. Hawley doing so, citing to the following language: "Thus, the assured helplessly awaited the determination of the question whether in that instance its policy of indemnity

was to be a shield in its own hands, or a sword in the hands of its antagonist." <u>Tyger</u> <u>River Pine Co.,</u> 170 S.E. at 349. However, read in context, the <u>Tyger River</u> court warned of this occurring when an insurance company reserved the right to defend and settle a case and then proceeded to do so in a manner that was in the insurance company's best interest, as opposed the insured's best interest. That is not the case here because Mt. Hawley never undertook the duty to defend or settle the underlying action.

Moreover, the court understands Mr. Prough's May 1 letter to express concern that ContraVest and its other insurers were contemplating a settlement agreement that would require an "artificial exhaustion" of ContraVest's primary polices so that Mt. Hawley, as the excess insurer, would be stuck paying the settlement when primary coverages still actually existed. The court does not understand this to be interfering with the settlement, especially when the communication was only sent to ContraVest and not to the plaintiffs in the underlying action. Finally, based on the timeline presented in the briefing, ContraVest did not give Mt. Hawley enough time to respond to its settlement demand because ContraVest settled prior to the deadline it gave Mt. Hawley to respond to the demand. At the hearing on the motion, counsel for ContraVest explained that Mt. Hawley had been clear that it would not settle, particularly during phone calls, which is why ContraVest settled prior to the deadline provided to Mt. Hawley. However, it's not clear to the court why ContraVest would provide Mt. Hawley the opportunity to respond to the settlement and a deadline to do so if that were the case, and the only evidence currently before the court is that ContraVest sent a letter with a settlement demand and a deadline to respond and Mt. Hawley responded via letter stating that the demand was moot because the settlement occurred prior to ContraVest's deadline. Therefore, Mt.

Hawley did not have the chance to interfere with the settlement with the underlying plaintiffs because the settlement occurred prior to Mt. Hawley's deadline. In sum, the court finds that Mt. Hawley owed ContraVest no duty to defend or settle the underlying action.

**B. No Obligation to Pay Based on Policy Language**

Next, Mt. Hawley contends that it has no obligation to pay any part of the Confession of Judgment, i.e. no duty to indemnify, because ContraVest failed to comply with the following term of the Excess Policies:

IV. CONDITIONS

I. LEGAL ACTION AGAINST US—No legal action shall be brought against us unless the insured has fully complied with all terms of this policy. In addition, no legal action shall be brought against us until the amount of the insured's obligation to pay has been finally determined. The insured's obligation to pay must be finally determined either by judgment against the insured after actual trial or by written agreement between us, the insured and the claimant.

The Excess Policies at 10/11–12 ("No Action Clause"). Mt. Hawley explains that ContraVest's obligation to pay under the Confession of Judgment did not arise from a judgment after an actual trial, and Mt. Hawley was not a party to the Confession of Judgment. Mt. Hawley draws the court's attention to several South Carolina cases that considered no action clauses. In <u>Sexton v. Harleysville Mut. Cas. Co.</u>, the insured paid a settlement to release a lien on his car and then sought to recover the amount of the settlement from his insurance company. 130 S.E.2d 475, 477 (S.C. 1963). The insured's automobile insurance policy contained a similar no action clause to the one at issue here. The Supreme Court of South Carolina concluded that

[t]he insured has no right of action against the [insurance company] in the absence of a judgment against him or an agreement fixing the amount of damages. The existence of such right of action is contingent upon the

rendition of a judgment against the insured.  Since there is an absence of a judgment against the insured he cannot maintain this action and is barred by the provision of the policy which forbids an action against the [insurance company] until the insured's obligation is fixed by a judgment against him.

Id. at 479.  This is true even when a party other than the insured brings an action against an insurance company.  See Travelers Indem. Co. v. Canal Ins. Co., 173 S.E.2d 656, 657 (S.C. 1970) (subrogee-company barred from recovering amount of subrogation claim from the insurance company of the subrogor-insured because the insurance policy contained a no action clause and there was no judgment entered against the subrogor-insured nor was there a written agreement between the subrogor-insured, claimant, and insurance company).  As such, Mt. Hawley argues that per the No Action Clause, Mt. Hawley has no obligation to pay the Confession of Judgment.

In response, plaintiffs cite to the following provision in the Excess Policies:

IV.  CONDITIONS

P.  PAYMENT OF LOSS—It is a condition of this policy that the insurance afforded under this policy shall apply only after the underlying insurance has been exhausted by payment of its limits of liability.  Upon final determination by settlement, award or verdict of the liability of the insured, we will promptly pay you as you shall pay, or be required to pay, the amounts of any losses falling within the terms or limits of this insurance. All losses covered under this policy shall be due and payable by us within thirty (30) days after they are respectively claimed and proof of loss filed with us in conformity with this policy.  Bankruptcy or insolvency of the insured shall no relieve us of any of our obligations hereunder.

The Excess Policies at 10/12 ("Payment Clause") (emphasis added).  Plaintiffs argue that this is a "condition," not a "term" or a "limit."  As such, plaintiffs contend that Mt. Hawley is required to promptly pay the Confession of Judgment, and if there is any ambiguity in the language, the language must be construed in favor of plaintiffs.  Mt. Hawley replies by explaining that the Confession of Judgment is not a determination of liability by award or verdict, and that to the extent that the Confession of Judgment is a

19

determination of liability by settlement, it does not comply with the No Action Clause and is unenforceable.

These two clauses can be read in harmony. The Payment Clause obligates Mt. Hawley to pay a settlement for any amount within the terms of the Excess Policies once underlying insurance has been exhausted. The No Action Clause requires that the insured's obligation to pay must be finally determined, i.e., settled with Mt. Hawley's participation, before the insured can bring a legal action against Mt. Hawley. As applied in this case, ContraVest's obligation to pay arises from the Confession of Judgment, which is part of the settlement agreement. Therefore, if ContraVest's underlying insurance was exhausted and the claims within the Confession of Judgment were within the terms of the Excess Policies, then Mt. Hawley would be obligated to pay the Confession of Judgment. However, because Mt. Hawley is not party to the Confession of Judgment, the No Action Clause bars plaintiffs from bringing a legal action against Mt. Hawley to force Mt. Hawley to pay the Confession of Judgment.

In response, plaintiffs rely upon Diamond Heights Homeowners Assn. v. Nat'l Am. Ins. Co., 277 Cal. Rptr. 906 (Cal. Ct. App. 1991) and Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 851 F.3d 976, 979 (9th Cir. 2017)). Plaintiffs claim that these cases "reconcile an excess insurer's contractual rights under 'no action' and 'no voluntary payments' clauses with the insured's rights under the implied covenant of good faith and fair dealing." ECF No. 195 at 16. As the Ninth Circuit explained, Diamond Heights stands for the proposition that

> an excess liability insurer has three options when presented with a proposed settlement of a covered claim that has met the approval of the insured and the primary insurer. The excess insurer must (1) approve the proposed settlement, (2) reject it and take over the defense, or (3) reject it, decline to

take over the defense, and face a potential lawsuit by the insured seeking contribution toward the settlement.

Teleflex Med. Inc., 851 F.3d at 979 (emphasis added) (citing Diamond Heights Homeowners Association, 277 Cal. Rptr. at 916).[4]  As such, "[u]nder Diamond Heights, the insured is entitled to reimbursement if the excess insurer was given a reasonable opportunity to evaluate the proposed settlement, and the settlement was reasonable and not the product of collusion." Id.  The Ninth Circuit was faced with a similar factual scenario in Teleflex Med. Inc. and concluded that the district court did not err in applying the Diamond Heights rule.

Mt. Hawley argues that the facts of this case are totally inapposite to the Diamond Heights facts.  Mt. Hawley explains that regardless of whether the claim was covered, when ContraVest demanded that Mt. Hawley pay $1.2 million of the $4.5 million settlement, ContraVest settled the case prior to the deadline it gave Mt. Hawley to respond.  Mt. Hawley also claims that it was never given the opportunity to provide a defense.  In other words, Mt. Hawley was unable to take any of the options articulated by Diamond Heights.  This does appear to be the case.  As explained above, the only evidence before the court is that ContraVest made a settlement demand with a deadline via a letter and that Mt. Hawley responded via letter that the demand was moot because ContraVest settled prior to the deadline.  Therefore, Mt. Hawley could not accept the proposed settlement, reject the settlement and take over ContraVest's defense, or reject the settlement and decline to take over the defense.  Therefore, even after the reconciliation of no action clauses and an insurer's duty of good faith that Diamond

---

[4] The court is cognizant that these cases are not based on South Carolina law and therefore not binding, but given the lack of South Carolina law on this issue and both parties' discussion of the law, the court nevertheless considers it.

<u>Heights</u> provides, the court still finds that Mt. Hawley is not obligated to pay the Confession of Judgment because the No Action Clause bars plaintiffs from bringing an action to obtain that payment.

### C.  No Obligation to Pay Based on Unenforceable Confession of Judgment

Mt. Hawley also argues that it is not obligated to pay the Confession of Judgment because when an insured confesses to judgment but has no intention or obligation to pay the judgment, the confession contravenes public policy and is not enforceable against the insurer.  In making this argument, Mt. Hawley relies on <u>Hitt v. Cox</u>, 737 F.2d 421 (4th Cir. 1984).

In <u>Hitt</u>, the plaintiff and the insured defendant reached a settlement for $350,000, and the insured defendant additionally agreed to assign another $150,000 to the plaintiff if the insured defendant succeeded in an action for indemnification against its insurance company.  <u>Id.</u> at 423. The insurance company was not involved in the settlement and challenged the conditional portion of the settlement.  The Fourth Circuit found that the insurance company was not liable to indemnify for the conditional settlement because that settlement was patently unreasonable.  <u>Id.</u> at 426.  The Fourth Circuit explained that once the defendant agreed to pay the plaintiff $350,000, it had no incentive to avoid the conditional award of $150,000 because the policy limit was $500,000.  In other words, the insured agreed to pay a certain amount within its policy limit and then said something along the lines of "if I can get the rest from my insurance company, you can have it." The Fourth Circuit found this to be impermissible because the negotiating parties no longer had adverse interests, making their conditional settlement presumptively unreasonable.  If the settlement had been allowed, then a precedent would have been set

"allowing any insured left to defend himself not only to settle at a reasonable amount, but to give away an additional amount up to the liability limit of the policy conditional on a successful indemnity suit against the insurance company." Id.

The Fourth Circuit considered a similar situation more recently where the court, applying South Carolina law, found the confession of judgment to be invalid:

> [A]ll of the evidence points to the conclusion that Stonehenge Engineering Corporation and National Stonehenge Corporation never intended to pay the Owners Association any excess of their respective confessions of judgment not covered by Wausau. With respect to National Stonehenge, under express terms of the Settlement Agreement, completely overlooked by the dissent, the Owners Association agreed not to file or execute upon the confession of judgment signed by National Stonehenge Corporation. Clearly, in this circumstance, National Stonehenge Corporation did not expect to pay any amount of the balance due on its confession of judgment out of its own resources in direct contravention of our holding in Hitt.

Stonehenge Eng'g Corp. v. Employers Ins. of Wausau, 201 F.3d 296, 306 (4th Cir. 2000).

Judge Patrick Michael Duffy also confronted similar facts that led him to conclude that the insurance company had no obligation to indemnify its insured for a confession of judgment:

> In both agreements, after the insured confesses a judgment for a specified amount, he is promised, through the same document, that satisfaction of the judgment will not be sought against him. In this instance, as was the case for the insured in Stonehenge, Payne did not expect to pay any amount due on his confession of judgment out of his own pocket, in direct contravention of the Fourth Circuit's holding in Hitt and Stonehenge.

St. Paul Travelers v. Payne, 444 F. Supp. 2d 519, 522 (D.S.C. 2006). This law has been consistently applied in similar factual scenarios in this district. See Peak Prop. & Cas. Ins. Corp. v. Davis, 2013 WL 1182679, at *3 (D.S.C. Mar. 21, 2013) (finding a settlement agreement to be unenforceable because "it [was] abundantly clear that [the insured defendant] did not expect to pay the judgment he confessed to out of his own

resources"); <u>NEMLORP, LLC v. Travelers Indem. Co.</u>, 2012 WL 13005322, at *6

(D.S.C. Feb. 9, 2012) (finding a confession of judgment to be unenforceable because the

underlying plaintiff and the insured defendant set the insurer's liability for an amount that

the insured had no intention of paying)

　　　Mt. Hawley argues that the facts here are the same as to those in the cases

discussed above.  The plaintiffs in the underlying action and ContraVest entered into a

settlement agreement in which ContraVest agreed to pay a certain amount, funded by its

other insurance carriers, and then further agreed to the Confession of Judgment.  The

Confession of Judgment states that "[i]n addition to the $3.3 million dollars paid by the

Participating Insurers, Contravest has confessed to a judgment in favor of Plaintiffs in the

principal amount of $9 million dollars . . . ."  ECF No. 1-3 at 6.  It continues: "It is the

intent and agreement of the Parties that the Judgment constitutes amounts that <u>may be</u>

<u>recoverable under insurance policies issued by the Non-Participating Insurer [Mt.</u>

<u>Hawley] only</u>, and does not include any amounts recoverable under any insurance

policies issued by any of the Participating Insurers." <u>Id.</u> (emphasis added).  In other

words, the parties agreed that they would only pursue payment of the Confession of

Judgment from Mt. Hawley.

　　　The conditionality of this settlement is not as blatant as the one in <u>Hitt</u>, but the

general principles are the same: the plaintiffs in the underlying action will only receive

the amount of the Confession of Judgment if Mt. Hawley pays for it because otherwise

ContraVest has no way of paying given its dissolution, and because Mt. Hawley did not

participate in the settlement agreement, it is clear that the only way Mt. Hawley would

pay is if it were found to be obliged to do so through a coverage dispute.  While

ContraVest assigned the rights to that suit to plaintiffs, as opposed to the insured bringing the suit itself in <u>Hitt</u>, the outcome is the same: the payment of the Confession of Judgment is dependent on the success of a coverage suit, and ultimately the insured is not liable for a judgment to be paid by its own resources.  Indeed, ContraVest could never be liable for the $9 million because it was dissolved, a fact that ContraVest knew at the time it signed the Confession of Judgment.  Schaffer acknowledged this in his deposition, stating that "given the choice of a potential jury trial with an unpredictable outcome and settling and then carving out and agreeing to, I guess, a judgment against two defunct entities was a better option than taking the risk of going to trial on an unpredictable outcome."  Schaffer Depo. 89:7–12.

Plaintiffs respond by arguing that the Confession of Judgment is not conditional, meaning that these cases are inapplicable.  However, as discussed above, the Confession of Judgment is conditional on a finding of coverage under the excess policies.  While the language does not explicitly say so, the only way the Confession of Judgment will be paid is if Mt. Hawley has to pay it, and right now, Mt. Hawley denies that it will.  Plaintiffs also point to language in the Excess Policies that states that bankruptcy or insolvency of ContraVest does not relieve Mt. Hawley of its obligations.  But that argument misses the point.  ContraVest's insolvency is relevant because it means that ContraVest, as one of the parties to the Confession of Judgment, could never be obligated to pay the Confession of Judgment, and that is what makes the Confession of Judgment unenforceable.  Therefore, the court grants summary judgment in favor of Mt. Hawley on this issue, meaning that Mt. Hawley has no duty to indemnify ContraVest for the Confession of Judgment.

### D. Breach of Contract

Plaintiffs alleged that Mt. Hawley breached the Excess Policies by failing to appropriately investigate the claims in the underlying action, failing to defend ContraVest, and failing to indemnify ContraVest. As discussed above, the court has found that Mt. Hawley had no duty to defend and has no duty to indemnify. In considering whether Mt. Hawley breached the Excess Policies by failing to appropriately investigate the claims, the court has failed to find any provision in the Excess Policies that requires Mt. Hawley to do so. Indeed, allegations about claim investigation usually arises from an insurer's obligation to act in good faith, not a contractual obligation. See BMW of N. Am., LLC v. Complete Auto Recon Servs., Inc., S.E.2d 902, 907 (S.C. Ct. App. 2012) (explaining that an insurer's good faith obligation "includes an insurer's duty to investigate a claim"). At the hearing on the motion, plaintiffs' counsel seemed to suggest that plaintiffs' bad faith claim was part of the breach of contract claim. However, that assertion contradicts well-established South Carolina law that the "bad faith action exists separately from an action in contract" and that a "breach of an express contractual provision" is not a prerequisite to brining a bad faith action. Tadlock Painting Co. v. Maryland Cas. Co., 473 S.E.2d 52, 55 (S.C. 1996)). Because the court finds that Mt. Hawley had no duty to defend, no duty to indemnify, and no duty under the Excess Policies to appropriately investigate the underlying claims, the court finds that Mt. Hawley did not breach the Excess Policies and grants summary judgment on this claim.

### E. Unjust Enrichment

Mt. Hawley argues that there is no legal basis for plaintiffs' assertion that if the particular coverage they seek for this claim is not provided under the Excess Policies,

then ContraVest is entitled to a return of its premiums.  Plaintiffs bring their unjust enrichment claim as an alternative theory of relief, alleging that "Mt. Hawley should be prevented from deriving the benefit of retaining the premiums while denying coverage and, in the alternative to a finding of coverage, the premiums should be returned to the ContraVest [sic]."  Compl. ¶ 49.

The elements of an unjust enrichment claim are "(1) [a] benefit conferred by plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value."  Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 532 S.E.2d 868, 872 (S.C. 2000).  Mt. Hawley argues that even if coverage for this specific claim is denied, ContraVest has still received the benefits of the Excess Policies for which ContraVest paid.  Plaintiffs do not respond to this argument.  Therefore, the court grants summary judgment in favor of Mt. Hawley on plaintiffs' unjust enrichment claim.

### F.  Bad Faith

Finally, despite seeking summary judgment on all claims, Mt. Hawley provides no explicit argument as to why summary judgment is warranted on plaintiffs' bad faith claim.  Based on plaintiffs' various arguments throughout the pendency of this case, the bad faith claim is based on Mt. Hawley's investigation and handling of the claim.  As plaintiffs explain, all of Mt. Hawley's arguments are based on the language of the excess policies or equitable considerations related to the settlement agreement, and as discussed above, "an insured need not prove a breach of an express contractual provision as a prerequisite to bringing a bad faith cause of action."  BMW of N. Am., LLC, 731 S.E.2d

27

at 907.  Therefore, none of Mt. Hawley's arguments at this time convince the court that summary judgment is warranted as to plaintiffs' bad faith claim.  If Mr. Hawley wishes to file another motion for summary judgment on the bad faith claim, it must be filed by March 15, 2020.

In sum, the court grants summary judgment in favor of Mt. Hawley as to the declaratory judgment claim, the breach of contract claim, and the unjust enrichment claim.  The court denies summary judgment on plaintiffs' bad faith claim.

## IV.  CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART AND DENIES IN PART** the motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON
UNITED STATES DISTRICT JUDGE**

**February 25, 2020
Charleston, South Carolina**